[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 152 
OPINION
 I. INTRODUCTION
F.G., the father of twin girls, G.G. and A.G., appeals from a dispositional order. In the published portion of this opinion, we discuss the father's contention that the juvenile court could not require the individual counseling increment of the reunification plan to address his repeated angry use of racial, ethnic and gender epithets. We conclude the juvenile court did not abuse its discretion when it so ruled. *Page 153 
 II. PROCEDURAL EVENTS LEADING TO THE CHALLENGED ORDER
The Welfare and Institutions Code[1] section 300 petition was fileo on January 27, 2009. The petition contained allegations of serious bodily hirm; failure to protect; serious emotional damage; and sibling abuse. (§ 300, subds. (a)-(c), (j).) After several continuances, the adjudication hearing was held on March 19, 24 and 27 and April 2, 2009. The twins were declared to be dependents pursuant to section 300, subdivisions (b) and (j). The juvenile court found the father used inappropriate discipline; G.G. "has exhibited explosive, aggressive, uncontrollable behavior requiring therapeutic, psychiatric intervention, and the father failed to obtain timely, necessary therapeutic, psychiatric intervention for the child despite numerous recommendation; for treatment"; and the father "has provided a chaotic home environment including regular and consistent confrontational behavior with the children's school and in the community . . . ."
At the conclusion of the adjudication hearing, the disposition hearing was held. The juvenile court ordered: the twins be placed in foster care; individual counseling for the twins and the father; visitation by the father three time;; per week including on the weekends; one hour of the visitation was to be unmonitored; the father participate in a fatherhood class; and the father's individual counseling address his use of sexist and racist language. In connection with this latter requirement, the juvenile court minute order states, "Father to be in individual counseling to address issues with a male therapist regarding father's racist and sexist views." The father filed a timely notice of appeal.
 III. EVIDENCE A. Detention Report
The detention report filed January 28, 2009, states the twins were taken into protective custody on January 22, 2009, by Santa Monica Police Department officers. G.G. had a bruise on the right side of her face, next to her eye. There were also two noticeable scratches next to her right eye. 3.G. told her teacher, Nathan Garden, that the father had slapped her face and pulled her hair. G.G. made the same revelation to the school principal, Tara Brown, a police community liaison officer, a school psychologist, and two Los Angeles County Department of Children and Family Services (the department) social workers. *Page 154 
According to the detention report the father is 55 years old; the mother is an anonymous egg donor; the twins were carried to term by a surrogate mother; both twins were in special education classes; A.G. had learning difficulties; and G.G. was treated for emotional difficulties. G.G., who had an individualized education plan, had temper tantrums during which she kicked, bit and ran around. Her temper tantrums were so severe that sometimes physical restraints needed to be used on G.G. School district staff asked the father for permission to have an evaluation performed on G.G. by the State Department of Mental Health. But he refused to permit such an evaluation to be performed.
There had been a large number of referrals to the department by the Santa Monica Police Department, anonymous citizens, and mandated reporters due to the father's temper and inappropriate behavior. The detention report relates the following: "Some of the incidents reported by Cory Rytterager, community liaison for [Santa Monica Police Department] are as follows: [December 11,] 2008, a [Santa Monica Police Department] Crossing Guard expressed concern about a little girl, later identified as [A.G.], who was struggling to keep up as she ran alongside a male (her father) on a bicycle. On [December 12 and 16,] 2008, John Muir Elementary School Principal Tristin Komlos called [Santa Monica Police Department] because [the father] was screaming at her staff. In September and October 2008, the school district bus drivers were refusing to transport [G.G.] to school because [the father] was screaming at the bus drivers. In early 2008, when the twins attended preschool, [Santa Monica Police Department] Juvenile Detective Trapnell received several calls from Pine Street Preschool Director Judy Abdo about father's explosive temper. . . . Father also made disparaging remarks to [Santa Monica Police Department O]fficer Navarro and an uninvolved minority stranger on a bench." Ms. Rytterager, the police community services liaison, said: "I saw the bruise on [G.G.'s] right temple. The bruise was red in color. I asked [G.G.] what [had] happened. . . . [G.G.] said her father slapped her and pulled her hair. [G.G.] said her sister . . . was in the bedroom and saw the slap and hair pulling." The preschool staff repeatedly tried to work with the father but he was always in a rage.
After the children were detained on January 22, 2009, Farideh Mostowfi interviewed the father. When advised the twins had been detained, the father told Ms. Mostowfi: "`[Y]ou want to keep them. You keep them.'" When asked about the bruise on G.G.'s face, the father responded: "`[S]he had no bruise this morning. She must have got it at school.'" When advised both of the twins said he had injured G.G., the father said: "`I did not slap the shit out of her. I had her by the chin and told her to calm down. I told her to clean every damn thing up and pick up everything.'" According to the father, G.G. had thrown items in the home around including her bed. Throughout the interview with Ms. Mostowfi, the father spoke loudly and belligerently. *Page 155 
During the interview, the father told Ms. Mostowfi: "`[D]id they tell you she had a bad day at school? She ran around like a wild animal. They had to drag her out of school. They told me to go and get her.'" When advised the twins' dependency case had been assigned to Ms. Mostowfi, the father :;aid, "`[Y]ou send a bitchwoman to get me, a single father?'" The father then said, "`[R]ight now, I am on vacation.'" When asked what he meant axmt being on vacation the father said: "`[Y]ou have an attitude. You have an accent. You don't understand English. You Iranian, you want me to kiss your ass, go back home.'" In reference to G.G., the father said: "`[N]o . . . one can rehabilitate her. I am her only salvation — if you think you can raise her better than me, you keep her.'" The father continued to act verbally abisive toward Ms. Mostowfi by making references to her culture; stating there was no point in continuing the conversation; calling her a "`bitch'"; and hanging up.
The twins were also interviewed by Ms. Mostowfi on January 22, 2009. G.G. said, "`[D]addy pulled my hair and hit me in the face.'" The father struck G.G. because she did not clean her room. Later, during the interview, G.G. said: "`[D]addy pulls my hair and hits me. That's why I don't like him.'" A.G. confirmed the father hit her on the buttocks.
Later, the twins were reinterviewed by another social worker, Eva Juhasz. They confirmed what they had revealed to Ms. Mostowfi. A.G. stated that the father's customary form of discipline was to spank the children on the buttocks. A.G. said to Ms. Juhasz: "`I'm scared. He's mean. . . . [H]e hit; me on my bottom. Pulls my hair. Sends me to bed.'" Both twins refused to answer questions as to whether the spanking occurred under or over their clothing.
On January 22, 2009, Ms. Juhasz interviewed Meredith Abrams, the school psychologist at G.G.'s school. Ms. Abrams stated: "`[G.G.] told me daddy hit her and pulle[d] her hair. She said, "[H]e yelled at me to clean up my room in five minutes. I felt sad and angry." The dad is verbally volatile. The school recommended [State Department of Mental Health] services about a year ago, but he did not want it.'" In December of 2008, the father told Ms. Abrams he was at his "wits' end" but became livid when she explained counseling was available at the school. The school staff was unable to work with hirr because of the father's volatility. Ms. Abrams indicated G.G. exhibited signs of obsessive-compulsive disorder and had a low tolerance for frustration.
The next day, January 23, 2009, Ms. Juhasz telephoned the father who denied knowing the twins were in protective custody. The father was advised of the detention hearing date. He became sarcastic and belligerent with Ms. Juhasz repeatedly stating she was an idiot and needed to grow up. *Page 156 
The detention report states the twins' grandmother, H.H., was interviewed. Later in the proceedings, it was clarified that H.H. is the twins' godmother. H.H. told Ms. Juhasz: "`The house is a pigsty, but he's not abusive with the girls. Maybe a spanking here and there. I've known [the father] for 25 years. I'm there twice a week. I'd like to see some changes. I'd like to see a housekeeper there. He's completely disorganized, he does not even have a dresser for the girls. . . . He even had a mouse in the house. The floor is way beyond washing. He says he does not understand why [G.G.] is way behind.'" When the subject of alcohol abuse was raised by Ms. Juhasz, H.H. stated: "`[A] problem with alcohol? Yes, on weekends when he's upset. Once he starts, he can't stop. Then he will get drunk.'" H.H. denied that the father was an alcoholic but admitted he could cut back. H.H. continued: "`But he's not belligerent because of the drinking. He does not like to be told what to do. He thinks the world is against a single dad.'"
Between 2004 and the date of the detention report, January 27, 2009, there had been 18 referrals to the department for general neglect, and emotional and physical abuse. Department social workers deemed 17 of the referrals to be unfounded. As to a September 24, 2006 referral for general neglect, the department characterized it as inconclusive. According to Ms. Juhasz, most of the general neglect referrals could not be investigated because the father would not allow access to the family home. The department social worker, Ms. Juhasz, recommended the twins be detained, "Current circumstances, combined with information that the caregiver has or may have previously maltreated children in his care, suggests that the children's safety may be of immediate concern based on the severity of the previous maltreatment or the caregiver's response to the previous incident."
Attached to the detention report was Ms. Rytterager's January 22, 2009 report. The report related the facts in the detention report concerning the discovery of the injury to G.G. Also, some aspects of Ms. Rytterager's report were set forth in the detention report. Additionally, Ms. Rytterager's report noted that in terms of 18 prior referrals to the department, Santa Monica police officers accompanied social workers because of the father's explosive temper. In 2007 and early 2008, a Santa Monica police detective received several telephone calls from a preschool director, Ms. Abdo. Ms. Abdo indicated the father exhibited an explosive temper when dealing with the twins' preschool teachers. The father referred to one teacher, Monica Simon, as a "`black crow'" because she is African-American. The preschool staff tried to work with the father but he was always in a rage. In mid-2008, a shopper saw the father screaming at one of the twins. The shopper was concerned about possible child abuse and notified the police. On September 12 and 16, 2008, Santa Monica officers were summoned to John Muir Elementary School because the father was screaming at the school staff. On September 12, the father was at the school because A.G. had a decayed *Page 157 
tooth. The father was advised to take A.G. to see a dentist. According to Ms. Rytterager, "Even though the tooth was decayed and causing [A.G.] tain, [the father] told the school staff that he wasn't taking her to the low cost dental office because he won't stand in line next to `stupid illegal Mexicans.'"
In December 2008, a Santa Monica police officer was present on campus attempting to deal with the father's "escalating" temper. Ms. Rytterager's report provides a broader description of what occurred to a Latino or Latina police officer than that which was summarized in Ms. Juhasz' deter tion report. The officer was identified only as Officer Navarro. Ms. Rytterager's report states, "[The father] made fun of Officer Navarro's accent." In January 2009, the father was yelling at an African-American man sitting on bench near the school office. A police officer had to intervene and admonish the father.
 B. The "Jurisdiction/Disposition" Report 1. Prior department contacts
On February 17, 2009, the department filed its "Jurisdiction/Disposilion" report (jurisdiction report). The jurisdiction report began with an analysis of 18 prior complaints of general neglect, emotional and physical abuse, and "substantial risk" regarding the father and the twins. Fourteen of the allegations were labeled unfounded. Two of the prior allegations, one for general neglect and another that the father placed the two children at substantial risk were determined by the department to be inconclusive. The allegations vere made by mandated reporters or unidentified complainants betweenJunt 24, 2004, and January 13, 2009. Thelma Gadson, a dependency investigator, related: "Although all of the numerous allegations that were investigate i by [the department] resulted with being evaluated to be unfounded, the fact [is] that various persons in various settings (e.g. grocery store, schools and home) over a period of five years have been concerned enough on many different occasions about the incidents of abuse and neglect of the children by the father."
Additionally, the jurisdiction report revealed that on April 18, 2008, a telephone call was made to the "Child Abuse Hotline" concerning physical abuse and general neglect of the children. This information was apparently not investigated by the department as it was not one of the 20 reports list id in the jurisdiction report which were found to be unfounded or inconclusive. The jurisdiction report describes the incident which was not investigated: "The reporting party stated that on [April 16, 2008, G.G.] ran into a tabk and sustained a serious injury to her mouth. The father was called to pick her up *Page 158 
from school. However, the school was unable to reach him." Although the father telephoned one-half hour later, he arrived at school the next day and made a hostile outburst.
 2. Witness statements
A significant portion of the interviews summarized in the jurisdiction report were matters already described in the detention report. Only new matters will be summarized here. G.G. was interviewed on February 10, 2009, after the January 27, 2009 detention hearing. She described again how the father struck her on the head. The father told G.G. to clean up her room in five minutes. She said her room was clean. Then he struck her on the head. According to G.G., the father "hit" A.G. Also, the father would pull A.G.'s hair. When asked why she was afraid of the father, G.G. responded, "Cause he hits me and pulls my hair." G.G. refused to answer questions asking her if she knew what constituted a "good" or "bad" touch. On February 12, 2009, A.G. stated that the father struck her on the arm. According to A.G., the father was more likely to strike G.G. G.G. acknowledged her father drank beer but would not answer the question of how he acted when he did.
Ms. Abrams, the school psychologist, was also interviewed. In addition to the discovery of G.G.'s injuries on January 21, 2009, Ms. Abrams described a prior January 13, 2009 incident. The father had placed a lit cigarette in G.G.'s ear. Ms. Abrams did not see any evidence of a burn to G.G.'s ear. But G.G. said she cried and was afraid after the cigarette incident. Mr. Garden, G.G.'s teacher, corroborated Ms. Abrams's discussion of the cigarette incident. The jurisdiction report relates Mr. Garden's recollection of G.G.'s complaint, "Mr. Garden stated . . . she stated that her father . . . `held a lit cigarette to her face.'" Mr. Garden stated: "[T]he father stated . . . that when [G.G.] doesn't `behave' the school was to call him and he would `tan her little fanny.'" The dependency investigator, Ms. Gadson wrote: "Mr. Garden stated . . . he was concerned about [G.G.'s] safety because the father `is not able to control his behavior. . . . He makes racist and sexist remarks. That's not a healthy environment to grow up in. Her social development is hindered by his angry and bigoted ways. If he makes the kind of comments about people he barely knows, there's no telling what he is saying to those children. It's not a good place for a child to grow up.'"
A school district consultant, Kristin Ferres, spoke to the father about the twins receiving a "psycho-educational evaluation" which was ordered by the juvenile court. The father refused to agree to the assessment as he retained control over the twins' educational rights. The jurisdiction report states in connection with the assessment request, "According to Ms. Ferres, the father was very difficult to have a conversation with and the consultation ended with the father stating that his final words on any [assessment or help was `NO, *Page 159 
NO, NO.'" Another district employee, Dorie Meek, a site supervisor, stated the father has an anger management problem but she saw no evidence of drug abuse on his part. Ms. Abrams, the school psychologist, was concerned about the father's aggression displayed towards school staff and whether he was also abusive to the twins.
Since being detained, the twins were enrolled in new schools. G.G., who has the individualized education program, had some initial problems at her new elementary school. G.G. acted out so violently at school that staff members were injured to the degree workers' compensation claims were filed. One teacher, Christina Hann, believed G.G.'s preference to take bubble baths was a "red flag" of possible sexual abuse. Ms. Hann saw G.G. as one who has had "`very difficult times'"; "`distrustful and reluctant to week adults for help'"; and qualified for "Special Education services."
As noted, the detention report sets forth certain statements by H.H., the twins' godmother. At one point, H.H. denied that the father hit or struck the twins or they were afraid of him. H.H. said, "`I can tell you that he's not hitting his girls.'" But at another point in the interview, H.H. admitted the father spanked the twins. Later during the interview, H.H. admitted the father would "`grab them by the ears'" when they would walk in front of him and acknowledged he could be a "real jerk." H.H. believed the children should be in their father's home. The dependency investigator was able to determine that H.H. picked up G.G. from school on April 16, 2008. This occurred after G.G. appeared at school with blood on her mouth. H.H. explained that the father "`slaps up the children'" and was abusing drugs. On Februajy 4, 2009, Julie Glazner, a social worker, interviewed H.H. According to H.H., the father confirmed he stated he did not want to stand in line with "Mexicans all day" in order to secure dental care for the twins.
The father was interviewed on February 9, 2009. The father denied striking G.G. on the face; claimed G.G.'s teacher inflicted the injury on G.G.; and stated he only used his left hand to spank the twins as his right hand was numb. The father stated: "I didn't see no scratch. Just a bruise. Her teacher gave her that, not me. I hit men. I don't hit kids." The father at one point during a February 12, 2009 interview stated he spanked the children or the buttocks. When asked how he went about being a father, he responded: "That's none of your business. Fuck them people in court." The father admitted he did not see the twins as a point of strength. Rather he characterized them as a ball and chain around his neck.
The father was willing to take an anger management class but refused to attend a 52-week long program. When the subject of a 52-week anger management course was raised, the father said: "[I am] not going to do it . . . *Page 160 
I'll go to jail. They can find me in contempt of [c]ourt." The father referred to the trial court, the Honorable Sherri Sobel, thusly: "`[T]hat Judge is not Kosher. She has a Kosher name, but she is not Kosher. Why do they want to torture me?'" The father complained because women were working on various aspects of his case. Later during the interview, the father said he would attend parenting classes and undergo a psychological evaluation but he would not take an anger management course. When the father was asked about drug use, he walked out of Ms. Gadson's office. The father then denied ever using any drugs. The father also indicated he drank wine but for religious purposes. The department report noted the father refused to accept personal service of the notice of the adjudication hearing. The father refused to sign a medical authorization and school records release form. The father further refused to provide proof of attendance at a parenting class.
 3. Placement analysis
The department investigator, Ms. Gadson, recommended the children not be placed with the father due to his episodes of violent physical, emotional and psychological abuse and neglect of the twins. Also, Ms. Gadson recommended the twins not be placed with their godmother, H.H. Ms. Gadson wrote: "[H.H.] continues to insist that [the] father does not abuse the children when that is contrary to the children's own consistent, independent reports. . . . [H.H.] also appears to be in denial and not forthcoming about the father's abuse and neglect . . . as well as his drug and alcohol abuse, issues to which she has raised concerns about in the past . . . . [H.H.] appears to be more committed . . . to protecting the father than ensuring the safety and well-being of these two young defenseless children." H.H. indicated she could not provide full-time care for the children. H.H.'s home was inspected and although it was necessary to move some cleaning supplies, it was otherwise in good order. Ms. Gadson requested that any visitation with H.H. be monitored. Ms. Gadson recommended the twins be suitably placed.
 C. Addendum Report
The addendum report reiterated some of the points in the jurisdiction report. Attached to the addendum report is the father's prior criminal record. He has numerous arrests. But the only conviction was for felony aggravated assault. (Pen. Code, § 245, subd. (a).) Also attached were copies of various medical and educational records for the twins and other documents.
 D. Walk-on Report
The walk-on report, filed March 11, 2009, reiterated the father's unwillingness to sign documents relevant to the twins' welfare. Further, the juvenile *Page 161 
court had ordered that the twins be provided a strict Kosher Dict. However, the twins were resistant to eating Kosher food and preferred to eat tacos, cheeses and the same food the foster parents ate. The twins were excited when they learned H.H. had made reservations for them at a Chuck E. Cheese restaurant. According to the department report, no Kosher foods are served at Chuck E. Cheese restaurants. The father provided either candy or cake during visits. Also, when the father was advised of the need to alter the visitation schedule, he at first refused to accept the letter requesting the change and threw it on the floor.
During one visit, the father saw a scratch on G.G.'s face. The fether demanded a photograph be taken of the scratch and eventually began shouting at the social worker. The father screamed in the twins' presence: "`I'm ordering you to take a picture of her face now . . . . This visit is over I will have your job.'" The father assumed a combative stance and had to be led out of the visitation area. According to G.G., she was accidentally scratched at a laundromat. The injury occurred when the foster mcther pushed a basket of clothes by and G.G. was accidentally scratched.
 E. March 27, 2009 Information for Court Officer
The March 27, 2009 information for court officer was received in evidence. The document indicated the father was charged in a misdemeanor comp aint with battery (Pen. Code, § 242); causing a child to suffer bodily injury (Pen. Code, § 273a, subd. (b)); and filing a false police report (Pen. Code, § 148.5, subd. (b)). A Santa Monica Police Department crime report, preparec by Ms. Rytterager, which apparently served as the basis of the misdemeanor complaint, was attached. According to Ms. Rytterager's report, on January 27, 2009, the father spoke to a school district official. The father alleged that Mr. Garden struck G.G. Ms. Rytterager's report then reiterated the allegations concerning the injury to G.G. and the father's inappropriate demeanor. On January 22, 2009, the father spoke to to Ms. Rytterager's report, on January 27, 2009, the father the conversation, the father made "numerous" racial slurs directed at Ms. Mostowfi's Iranian heritage. Ms. Rytterager related: "[The father] told Mostowfi she could not speak English and was a `bitch woman.' When Mostowfi asked [the father] if the twins had bod allergies, [he] said, `Yeah, they're allergic to Iranian food and Iranian incense.'" While yelling at Ms. Mostowfi, the father referred to Ms. Jul asz, who had interviewed him for the detention report, as a "`bitch woman.'" When Ms. Mostowfi directed the father to stop yelling at her, he said, "`You want me to kiss your Iranian ass? I'm on vacation.'" During the January 22, 2009 interview the father never claimed Mr. Garden struck G.G. Further the father never alleged Mr. Garden struck G.G. during the January 27, ;!009 detention hearing. *Page 162 
 F. April 2, 2009 Last-minute Information Document
A document containing information developed on April 1, 2009, was received in evidence. The father was refusing to come to the department's West Los Angeles office for visits. Due to the father's abusive and confrontational behavior, the department insisted that visitation occur at its West Los Angeles office. The father was offered bus passes or taxi fare so he could visit with the twins. Further, on numerous occasions, the father said "`fuck you'" and "`mother fuck you, go back to Africa'" to a social worker identified only as "Services SCSW Degbor" in the document.
 G. The Psychological Evaluation
On January 28, 2009, the juvenile court appointed Dr. Nancy Kaser-Boyd to prepare a psychological evaluation of the father. The psychological evaluation was considered only in connection with the disposition hearing. The father was interviewed by Dr. Kaser-Boyd on February 13, 2009. The father began by complaining the juvenile court referee, his lawyer and Dr. Kaser-Boyd were women. The father asked, "`How would you feel if everybody on your case was a man?'" Throughout the interview, he was alert to issues of ethnicity, social class and gender. Dr. Kaser-Boyd wrote: "[H]e said he had been sure that both my [personal assistant,] Mandy, and myself were Pakistani. . . . At times, [the father] called me `honey.' Later in the interview, he made comments about `Mexican women' who throw away their babies, and about `rich women.'" To Dr. Kaser-Boyd, these statements by the father were of significance given the racial stereotyping reflected in the detention report which she had reviewed.
In Dr. Kaser-Boyd's view, the father was uncooperative during the interview. He gave only one-word answers to most questions. Or he would give incomplete answers to questions. Also, the father refused to provide any of his personal history during the interview. He stated he worked as a plumber and a hairdresser. As a hairdresser, he met H.H. The father claimed to have a law degree and played college football. But he refused to identify any of the schools he attended.
In terms of the twins, the father said they were born prematurely. He stayed at the hospital with them and paid all of their expenses. The father told Dr. Kaser-Boyd, "`That's `cause I love them . . . you could take the easy way out or, like them Spanish women, put them in the trash can.'"
The father, who denied striking G.G., stated he was "tickled pink" about her school in Santa Monica. The father believed it would be impossible to find a better school system than the one in Santa Monica. If the criminal case *Page 163 
was dismissed, he intended to send G.G. back to the same Santa Monica school she attended albeit with a different teacher. He denied that he struck G.G. or he was angry. He would experience anger only if his daughters or his mother were injured.
The father expressed disdain about taking the Minnesota Multiphasic Personality Inventory-2 asking, "`What kind of bullshit is this?'" However, the test results indicated the father was concerned about how others viewed him. When the interview concluded, Dr. Kaser-Boyd described what happened, "[The father] said goodbye and his parting comment was that my hairdresser should use fewer highlights and do more to fluff my bangs."
Dr. Kaser-Boyd was unable to provide any definitive information giver the father's interaction with her. Further, she indicated he was "far more defensive" than the typical patient referred to her. Dr. Kaser-Boyd recommended that another examination be conducted after the adjudication hearing and that a male examiner be used.
 H. Testimony 1. A.G.'s testimony
A.G. testified that she was expected to keep their room clean. G.G. was also expected to keep the room clean. A.G. failed to clean their room anc the father hit her on the buttocks with an open hand. According to A.G., the father also struck G.G. on the "hair." A.G. testified he pulled "very hard" on G.G.'s hair. He only stopped pulling on G.G.'s hair when she started crying.
A.G. was asked if the father ever hit her. At first, A.G. testified the father never struck her. But A.G. then changed her testimony and admitted the father struck her on the buttocks with his open hand. A.G. said the father yelled at her a lot. A.G. indicated she asked her father not to yell at her. The father would not respond to A.G.'s pleas to stop yelling at her. A.G. wanted to return to her father's custody. When she lived with her father, it was fun to play with him.
 2. Mr. Garden
Mr. Garden was G.G.'s teacher before she was placed in foster care. Mr. Garden was assigned to teach students with emotional disturbances. Mr. Garden had first met the father at the beginning of the school year. Mr. Garden described their initial meeting, "He was kind of ranting and raving, wanting to know why his daughter wasn't picked up on time, and he *Page 164 
was complaining about having missed a day of work." Prior to the January 22, 2009 discovery of the injury to G.G., the father telephoned to protest a complaint to the department about an incident in a drugstore where he allegedly pulled on one of the twins' ears. Mr. Garden described their conversation: "He wanted to know if the reports came from me. This was earlier in the year. I said, no I don't know the nature of any [department] reports. He said I got this second generation Mexican cop standing in my face, this you know, five feet tall, screaming at me." Also, the father objected to a low-cost dental voucher he had been given for the twins and said, "[W]hen he arrived there he had to wait with a bunch of Blacks and Mexicans and he wasn't going to stand for that."
On January 22, 2009, about 45 minutes after the start of the school day, Mr. Garden saw the injury above G.G.'s eyebrow. Mr. Garden did not notice the injury earlier because G.G.'s hair was covering the mark. Normally, G.G. wore her hair back. But on that morning her hair was not pulled back. It was not until Mr. Garden helped G.G. fix her hair that he saw the injury. Mr. Garden asked G.G. what caused the injury. When she responded, he took her to the school office. G.G. was interviewed later by several administrators and Ms. Rytterager. Mr. Garden described what he said to Ms. Rytterager, "I explained to Cory that [G.G.] had just told Mrs. Abrams and I that her father had struck her on the face."
Prior to January 22, 2009, G.G. was prone to "environmental destruction" which included "trashing the room, throwing books, knocking desks over" and the like. On January 21, 2009, G.G. had engaged in environmental destruction and the father was notified. The father picked G.G. up before the end of the kindergarten school day on January 21, 2009. When the father picked up G.G. on January 21, 2009, Mr. Garden did not see any bruises on her face. Mr. Garden denied striking G.G. and was unaware a misdemeanor complaint had been filed against the father.
Ms. Abrams had been involved in developing a plan to address G.G.'s destructive behaviors. The subject of preparing an assessment to evaluate G.G. was raised with the father. The father refused to have such an assessment prepared for G.G.
Mr. Garden believed that the father loved the twins. But Mr. Garden believed the father was overwhelmed by the demands of raising the twins. Further, in telephone conversations with Mr. Garden, the father made sexist and racist remarks. Coupled with comments made by G.G. and these telephone conversations, Mr. Garden was concerned about the twins' welfare. Mr. Garden admitted he knew very little about A.G. other than she was in a general education class. *Page 165 
During the adjudication hearing, Mr. Garden was asked if he feared retaliation because of his testimony. While Mr. Garden was testifying, the father interrupted as follows: "[Mr. Garden]: I'm concerned for my safety. I think [the father] — he strikes me as a man — a very unhinged, desperate man. [¶] The father: You would be too with two kids."
 3. Christina Hann
Ms. Hann was G.G.'s kindergarten teacher. When interviewed by a department social worker, Ms. Hann reportedly stated that G.G. talked about taking bubble baths. Ms. Hann stated that taking bubble baths was a "red flag" for possible sexual abuse. This statement was consistent with her training is a school teacher. G.G. was a special needs child who actively sought out and engaged adults. G.G. has been identified as a child with to or have any contact with Ms. Brennan. For example, when Ms. school.
 4. Rosita Brennan
Ms. Brennan was a social worker assigned to provide services, including visitation, to the father and the twins. However, it was difficult to assist the father because he refused to speak to or have any contact with Ms. Bren lan. For example, when Ms. Brennan attempted to give the father a letter concerning a change in the visitation schedule, he threw it on the floor. The father then yelled that he was not taking anything from nor would he speak to Ms. Brennan. When Ms. Brennan saw the father on the day she testified, March 19, 2009, he said, "[F]uck you." Once the father did call Ms. Brer nan and when she answered, said, "[Y]o comprende, Rosita?" Ms. Brer nan described what happened when the father, during a visit, saw a scratch on a twin's face: "[The father] kept yelling at me, telling me that — to tale a picture of it now. . . . And I was trying to interview the child. And he told me, I'm ordering you to take a picture of it now. And [the father] came up to me. He came right up to my face and he had his fist . . . ." At this point in her testimony, the father interrupted Ms. Brennan and said: "No. No way." Ms. Brennan continued testifying despite the father's interruptions. She testified, "[He had his left fist] clenched and [he] said, I'm ordering you to take a picture of her face now. And, if you don't do it, I'll have your job.' At this point, a department staffer escorted the father from the room. The children were present when this incident occurred. G.G. was crying while A.G. continued to play with some toys. While testifying, Ms. Brer nan was advised that the twins, prior to their detention, regularly visited with the paternal grandmother who was in a long-term care facility. Ms. Brer nan agreed to insure the twins could visit the paternal grandmother. *Page 166 
 5. Patricia Allen
Ms. Allen testified she had a "landlord/tenant" relationship with the father. When she was home, Ms. Allen saw the father on a daily basis. She had seen the father drink alcohol. Although Ms. Allen had seen the father under the influence of alcohol, she had never observed him to be so intoxicated he could not care for the twins. Additionally, Ms. Allen denied seeing the father physically abuse A.G. with great force; hearing any sort of altercation; or ever observing that the father's apartment was infested with rodents. In Ms. Allen's opinion, the father was very patient with the twins, got them ready for school every morning and picked them up after classes were concluded. When cross-examined, Ms. Allen had considerable difficulty describing how often she was in the father's residence. She had never seen the father exhibit his temper.
 6. H.H.
H.H. met the father in the early 1980's and she characterized their relationship as, "Friends." H.H. had known the twins since their births. H.H. had never seen the father, whom she described as "hard-headed," impose any excessive discipline on or be under the influence of alcohol to the degree he could not care for the twins. H.H. admitted she may have said something different when interviewed for the detention deport. Further, H.H. had never seen evidence of rodent infestation although she may have heard the father and the twins mention a mouse. H.H. agreed that the father could use some housekeeping lessons but the family home was not unhealthy. However, H.H. conceded she did use the term "pigsty" while describing the family home when interviewed for the detention report. But she claimed her description of the residence as a "pigsty" was taken out of context. H.H. described the family home as extremely disorganized and papers were allowed to pile up. Also, H.H. had tried to assist the father in cleaning up the home but he still could not handle the laundry. Further, the father did not speak to the twins in a demeaning fashion although the father has a booming voice. But H.H. admitted the father "yells" at the twins. H.H. had never seen the twins act as if they were fearful of the father nor had she seen him spank them. H.H. had heard about spankings and actually seen the father strike the hand of one of the twins. On occasion with G.G., the father would squeeze her ear to help her calm down. According to H.H., the father claims to have learned this technique while studying acupuncture in an unidentified Hong Kong college. *Page 167 
 IV. DISCUSSION A. Count b-7*
 As to count b-7, the juvenile court found, "The father has provided a chaotic home environment including regular and consistent confrontational behavior with the children's school and in the community causing an inability to meet the special needs of his children." The father argues the count b-7 finding is not supported by substantial evidence. The father asserts there is no substantial evidence the conduct described in count b-7 exposed the twins to a substantial risk of serious physical harm or illness. To begin with, as there are other grounds to support the jurisdictional order, even if we were to find there is no substantial evidence, we would affirm. If there is one basis for jurisdiction, it is irrelevant the evidence is legally insufficient as to other grounds. (In re AlexisE. (2009) 171 Cal.App.4th 438, 451; Randi R. v.Superior Court (1998) 64 Cal.App.4th 67, 72.)
Nonetheless, there is substantial evidence to support the count b-7 finding. There was evidence the father: yelled at the twins with a "loud, booming voice"; regularly spanked the children and pulled their hair; physically injured G.G. due in material part to his inability to control his temper; drank too much when he was upset and on weekends; on numerous occasions was unable to control his temper; and regularly made racist and sexist statements. As a result of his angry outbursts and overall volatility, the father could not work effectively with school officials. During one visit with the twins, the father became irate when a social worker did not photograph a scratch on G.G.'s face. As a result, the father had to be escorted out of the visitation area. In a school psychologist's opinion, the father exhibited signs of obsessive-compulsive disorder and had a low frustration tolerance level. The juvenile court could find the father provided a chaotic home environment which had already resulted in physical injury to G.G. Thus, there is substantial evidence of risk to the twins.
 B. The Scope of the Counseling Order
The father argues the case plan must be modified to delete the requirement he undergo counseling to address his racist and sexist remarks. The father reasons that a reunification plan must be formulated to resolve the conditions which led to the jurisdictional order. Since no sustained finding was returned that the father made racist and sexist remarks in the presence of the twins, he argues that the juvenile court could not require him to undergo counseling which addresses that issue. We respectfully disagree.
Section 362, subdivision (c) identifies the orders that may be imposed on parents as part of the dispositional order: "The juvenile court may direct any and all reasonable orders to the parents or guardians of the child who is the subject of any proceedings under this chapter as the court deems necessary and proper to carry out the provisions of this section . . . . TThat order may include a direction to participate in a counseling or education program, including, but not limited to, a parent education and parenting program operated by a community college, school district, or other appropriate agency designated by the court. . . . The program in which a parent or guardian is required to participate shall be designed to eliminate those conditions that led to the court's finding that the child is a person described by Section 300." Further, section 202, subdivision (a) states in part: "The purpose of this chapter is to provide for the protection and safety of the public and each minor under the jurisdiction of the juvenile court and to preserve and strengthen the minor's family ties whenever possible, removing the minor from the custody of his or her parents only when necessary for his or her welfare or for the safety and protection of the public. If removal of a minor is determined by the juvenile court to be necessary, reunification of the minor with his or her family shall be a primary objective. . . . This chapter shall be liberally construed to carry out these purposes." Section 202, subdivision (d) states: "Juvenile courts and other public agencies charged with enforcing, interpreting, and administering the juvenile court law shall consider the safety and protection of the public, the importance of redressing injuries to victms, and the best interests of the minor in all deliberations pursuant to this chapter. Participants in the juvenile justice system shall hold themselves accountable for its results. They shall act in conformity with a comprehensive set of *Page 168 
objectives established to improve system performance in a vigorous and ongoing manner." California Rules of Court, rule 5.695(f) requires that reunification services be designed to facilitate reunification of the family: "[I]f a child is removed from the custody of a parent or legal guardian, the court must order the county welfare department to provide reunification services to the child and the child's mother and statutorily presumed father . . . to facilitate reunification of the family."
Our Supreme Court has synthesized these statutory provisions thusly: "The overarching goal of dependency proceedings is to safeguard the welfare of California's children. (In reJosiah Z. (2005) 36 Cal.4th 664, 673 [31 Cal.Rptr.3d 472,115 P.3d 1133].) `Family preservation, with the attendant reunification plan and reunification services, is the first priority when child dependency proceedings are commenced. [Citation.] Reunification services implement "the law's strong preference for maintaining the family relationships if at all possible." [Citation.]' (In re Elizabeth R. (1995)35 Cal.App.4th 1774, 1787 [42 Cal.Rptr.2d 200].) Reunification services are typically understood as a benefit provided to parents, because services enable them to demonstrate parental fitness and so regain custody of their dependent children. [Citation.]" (In re Nolan W. (2009) 45 Cal.4th 1217,1228 [91 Cal.Rptr.3d 140, 203 P.3d 454].) The adequacy of the reunification plan is judged according to the circumstances of each case. (Amanda H. v. Superior Court (2008)166 Cal.App.4th 1340, 1345 [83 Cal.Rptr.3d 229]; Robin V. v.Superior Court (1995) 33 Cal.App.4th 1158, 1164
[39 Cal.Rptr.2d 743].) Our colleagues in Division Seven of this appellate district described the discretionary nature of dependency reunification orders: "These general provisions have been broadly interpreted to authorize a wide variety of remedial orders intended to protect the safety and well-being of dependent children (see In re Jose M. (1988)206 Cal.App.3d 1098, 1103-1104 [254 Cal.Rptr. 364] [`The juvenile court has broad discretion to determine what would best serve and protect the child's interest and to fashion a dispositional order in accordance with this discretion. [Citations.] The court's determination in this regard will not be reversed absent a clear abuse of discretion.']) . . . ." (In re CarmenM. (2006) 141 Cal.App.4th 478, 486 [46 Cal.Rptr.3d 117].)
No abuse of discretion occurred. The challenged order is a reasonable response to the fact specific aspects of this case — the father's repeated angry use of racial, ethnic and sexist epithets at the twins' school and in his interactions with the childcare professionals. As noted the juvenile court found the father used inappropriate discipline; G.G. "has exhibited explosive, *Page 169 
aggressive, uncontrollable behavior requiring therapeutic, psychiatric intervention, and the father failed to obtain timely, necessary therapeutic, psychiatric intervention for the child despite numerous recommendations for treatment"; and the father "has provided a chaotic home environment including regular and consistent confrontational behavior with the children's school and in the community . . . ."
There is substantial evidence the father was angry on many of the occasions upon which he used racist, ethnic and sexist epithets. In ether words, the use of racist, ethnic and sexist epithets often arose in the context of anger management issues. For example, as noted, during the interview with a social worker, Ms. Mostowfi, the father while speaking loudly and belligerently, stated: "`[Y]ou have an attitude. You have an accent. You con't understand English. You Iranian, you want me to kiss your ass, go back home.'" According to a supplemental report prepared by Ms. Rytterager, during the conversation with Ms. Mostowfi, the father made "numerous" racial slurs. Also, the father called Ms. Mostowfi a "bitch woman." Further, he said Ms. Mostowfi could not "speak" English. When asked whether the twins had any food allergies, the father said to Ms. Mostowfi, "`Yeah, they're allergic to Iranian food and Iranian incense.'" When advised Ms. Juhasz was assigned the twins' case, the father loudly and belligerently told her, "`[Y]ou send a bitchwoman to get me, a single father?'" Throughout the conversation with Ms. Mostowfi, he was verbally abusive as he made derogative references to her culture, called her a "bitch" and hung up on her. In the information for court officer, Ms. Gadson reported the father "displays extremely union-trolled and violent behaviors with adults in a professional setting" and sad to a social worker, "`[F]uck you' and `mother fuck you, go back to Africa . . . .'"
Further, the father used racist, ethnic and sexist epithets while angrily interacting with school staff. For example, Ms. Komlos, the school principal, had to have "School Resource Officer Navarro" intervene when the father's temper began to escalate. The father made fun of Officer Navarro's accert. In January 2009, Ms. Komlos had to summon the police because the father was angrily yelling at an African-American man. Also, the father called Ms. Simon a "`black crow'" because she was an African-American.
The circumstances which led to the jurisdictional order involved in material part the father's angry response to G.G.'s failure to keep her room clean and his chaotic rage when interacting with the twins' teachers and cither school staff. The juvenile court could reasonably conclude that the father's use of racist and sexual epithets, often under circumstances where he was angry, was but part of his broader anger management problem. The challenged aspect of the reunification order responds to the circumstances of this case. *Page 170 
Further, the department is legally obligated to carry out the reunification program. Our colleague, Presiding Justice Barbara J. R. Jones of Division Five of the First Appellate District, described the role of the department in carrying out the juvenile court law: "The social services agency has the initial responsibility to investigate allegations of abuse or neglect and has authority to take temporary custody of an abused or neglected child. (§ 306.) But the agency must account to the court on the reasons for removing the child from home and on the services available to facilitate the child's return. (§ 319.) When, at the disposition hearing, the court decides to keep the child out of parental custody, the court must (with exceptions) order the social services agency to provide child welfare services to the parents and the child with the aim of reuniting the family. (§§ 300.2, 361.5, subd. (a).) [¶] In providing child welfare services, the county's social services agency acts as an administrative agency of the executive branch, subject to supervision by the State Department of Social Services. [Citations.] The juvenile court maintains ultimate control over the delivery of services through its authority to decide that the services offered or provided to the parents were unreasonable and that further services must be offered by the social services agency." (In re AshleyM. (2003) 114 Cal.App.4th 1, 7 [7 Cal.Rptr.3d 237]; seeIn re Daniel G. (1994) 25 Cal.App.4th 1205, 1213-1215
[31 Cal.Rptr.2d 75].)
The juvenile court could reasonably conclude that for the reunification plan to achieve its mandated goal — resolving the problems that gave rise to dependency jurisdiction — social workers must be able to effectively work with the father. The department is statutorily obligated to provide reunification services. We need not reiterate the father's habitual use of insulting racial and gender epithets uttered when he is angry or in a calmer state of mind to the childcare professionals in this case. It is difficult for social workers to provide those services when they are consistently subjected to racist, ethnic and sexist epithets. The ability of the father to work with social workers and school personnel and thereby achieve the results of the reunification plan will be enhanced if he understands, which counseling on the subject can help him comprehend, that in a diverse culture such as in Los Angeles County, he cannot consistently insult women and all persons who are different from him who are working with him to reunify the family. The juvenile court has discretion to design a reunification plan that hopefully will work and take reasonable steps to make it achieve the desired result.
The father argues that since the jurisdictional findings do not explicitly speak to his use of racial, ethnic and gender invective, the reunification plan could not address that issue. As noted, there is substantial evidence the father, when angry, regularly uses racist, ethnic and sexist epithets. And, the juvenile court could reasonably find the father's repeated use of racist, ethnic and sexist epithets whether while he is angry or calm interferes with the implementation of the legally mandated reunification plan. There is no *Page 171 
statutory requirement a jurisdictional finding recite every aspect of parental unfitness that will eventually constitute the specifics of the reunifies tion program. The reunification plan must be designed to resolve the conditions which led to the jurisdictional finding. Here, the juvenile court recognized, the father's use of racial, ethnic and gender epithets is part of his cycle of anger and interferes with the implementation of the reunification program. By addressing this matter in counseling, the juvenile court reasonably could find the other issues of excessive discipline, a chaotic home environment and angry interactions with school personnel could be resolvable, all of which is in the twins' best interests.
 V. DISPOSITION
The order under review is affirmed.
Kriegler, J., concurred.
[1] All further statutory references are to the Welfare and Institutions Code except where otherwise noted.
* See footnote, ante, page 150.